**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Brodsky, ) | No. CV 06-00125-PHX-EHC |
| )  Plaintiff, ) | **ORDER** |
| ) vs. ) | |
| ) Michael J. Astrue*, *Commissioner, Social* ) *Security Administration*, ) | |
| ) Defendant. ) ) | |

    This is a proceeding to review a final decision of the Defendant Social Security Commissioner ("Commissioner") denying disability benefits to Plaintiff Robert Brodsky. The parties filed a cross-motions for summary judgment (Dkts. 13, 19), which are fully briefed.

**I.     Background**

    Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on March 18, 2003. (Tr. 50-52). Plaintiff alleged that he became disabled on February 2, 2001, due to "pain in back and efects [*sic*] from spraying laquer on cabinets[.]" (Tr. 57). Plaintiff's disability onset date was subsequently

---

*Michael J. Astrue, who was sworn in as Commissioner of Social Security on February 12, 2007, is substituted as the Defendant in place of Jo Ann Barnhart pursuant to Fed. R. Civ. P. 25(d)(1).

amended to September 30, 2002. (Tr. 98). Plaintiff's DIB application was denied on August 20, 2003. (Tr. 27-31). Plaintiff requested reconsideration (Tr. 32), and on January 29, 2004, the Social Security Administration determined that Plaintiff's DIB claim was properly denied. (Tr. 35-37). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on February 10, 2004. (Tr. 38). The ALJ held a hearing on April 27, 2005. (Tr. 15, 42). Plaintiff appeared at the hearing represented by counsel. (Tr. 200-220). Plaintiff testified, as did vocational expert Mark Kelman. (Tr. 200-220). The ALJ denied Plaintiff's application in a decision dated July 25, 2005. (Tr. 12-21). The Appeals Council denied Plaintiff's request for review. (Tr. 6-8). Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

**II.     Evidence in the Record**

      **A.     Education and Employment Background**

Plaintiff was born on July 6, 1952. (Tr. 50). Plaintiff has a high school education and worked as a house painter until 2001, when he stopped working due to his pain. (Tr. 141; 200-220). Plaintiff was married until 1999 or 2000, and prior to his divorce, his wife handled the paperwork and ran his business. (Tr. 141; 200-220). Plaintiff has two daughters from his marriage. (Tr. 141).

      **B.     Medical History**

On September 30, 2002, the amended onset date, Plaintiff began treatment with Charles Lindsay M.D. Dr. Lindsay diagnosed recurrent colon polyps, low back pain, fatigue, and osteoarthritis. (Tr. 105). Dr. Lindsay reported tenderness to palpatation of the thoracic and lumbar paravertebral muscles. (Tr. 18; 105). Radiological studies in September 2002, revealed an old compression fracture at the L4 vertebral body, and reasonably well-preserved disc spaces. (Tr. 18; 109).

On May 9, 2003, Plaintiff complained that he was unable to sleep because of back pain and had been out of his medicine for about one month. (Tr. 101). Dr. Lindsay noted that Plaintiff was to drop his weight by about thirty pounds to help the back pain. (Tr. 101). Dr. Lindsay also noted a compression fracture at L4. (Tr. 101).

On June 30, 2003, Plaintiff was referred by Disability Determination Services ("DDS") to Robert D. Barker, II, M.D. Dr. Barker did not perform a complete physical and noted that he had no old records to review. (Tr. 110-112). Dr. Barker noted that Plaintiff had no fatigue, weakness, fever, nights sweats or sleep disturbance. (Tr. 110-112). Dr. Barker noted some tenderness on the lateral epicondyle of the right elbow suggesting tendinitis or tennis elbow. (Tr. 110-112). Plaintiff complained to Dr. Barker of low back pain with internal and external rotation of his hips. (Tr. 110-112). Dr. Barker noted that Plaintiff did not do actual rotation during the exam, but a simulated rotation. Dr. Barker noted that history, observations and finding have multiple inconsistencies with regard to Plaintiff's back. (Tr. 110-112). Dr. Barker opined that Plaintiff could lift fifty to one-hundred pounds occasionally, lift twenty-five to one-hundred pounds frequently, stand six hours in an eight-hour day, sit six hours in an eight-hour day, and did not require alternating standing and sitting beyond normal breaks. (Tr. 110-112). Dr. Barker put no limits on pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, felling, seeing, hearing, or speaking. (Tr. 110-112).

On December 12, 2003, Plaintiff was referred by DDS to Mohammad A. Kazmi, M.D. for a consultive neurological examination. (Tr. 150-153). Dr. Kazmi diagnosed a left rotator cuff problem and acromioclavicular joint dysfunction, intractable lower back pain most likely from spinal stenosis, cervical pain of musculoskeletal nature, and chronic intractable pain in the shoulder, lower back and neck. (Tr. 150-153). Dr. Kazmi's physical examination revealed that Plaintiff was able to move his left shoulder up to ninety degrees, flex twenty to thirty degrees, and extend very little without much pain and abduct up to forty-five to sixty degrees with pain. Dr. Kazmi opined that Plaintiff could lift up to twenty pounds occasionally, lift ten to twenty-five pounds frequently, stand and walk for less than two hours in an eight-hour day, and sit for half-an-hour in a six-to eight-hour day. (Tr. 150-153). Dr. Kazmi also opined that reaching above the shoulder with the left arm would be difficult and painful, but that Plaintiff would occasionally be able to climb, balance, stoop, kneel, crouch,

1  and crawl, and would have no problems with handling using his fingers, feeling, seeing,
2  hearing, or speaking. (Tr. 150-153).

3  On January 12, 2004, Plaintiff saw Dr. Lindsay. (Tr. 189). Plaintiff complained of
4  lower back pain and left shoulder pain. (Tr. 189). Dr. Lindsay opined that Plaintiff could
5  not do any jerking or lifting. (Tr. 189). Dr. Lindsay also noted that x-rays of Plaintiff's left
6  shoulder revealed arthritic involvement of the AC joint, but no evidence of fracture,
7  dislocation, or joint narrowing. (Tr. 190). In a follow-up exam on January 29, 2004, Dr.
8  Lindsay reported pain at the AC joint with palpatation, decreased range of motion and
9  glenohumeral fossa pain. (Tr. 18, 188). Dr. Lindsay indicated a need for an MRI of the left
10 shoulder. (Tr. 188).

11 On April 2, 2004, Plaintiff complained of neck and back pain to Dr. Lindsay. (Tr.
12 184). Dr. Lindsay diagnosed muscle spasms on the right trapezius and bursitis on the right
13 shoulder. (Tr. 184). Plaintiff received a trigger point injection to the right shoulder. (Tr.
14 184). Plaintiff saw Dr. Lindsay again on June 30, 2004, who ordered physical therapy for
15 Plaintiff's right shoulder. (Tr. 182). On July 26, 2004, Dr. Lindsay reported that Plaintiff
16 had not taken his blood pressure medicine for one week while he was out of town, and noted
17 continued lower back pain. (Tr. 181).

18 On January 4, 2005, Plaintiff reported to Dr. Lindsay continued lower back pain and
19 left shoulder pain. (Tr. 180). Dr. Lindsay reported trigger points in Plaintiff's left shoulder,
20 suggestive of adhesive capsulitis. (Tr. 180). Dr. Lindsay also noted extremely elevated
21 blood pressure and that Plaintiff had been out of medications for one month. (Tr. 180). Dr.
22 Lindsay reminded Plaintiff to take his blood pressure medication. (Tr. 18, 181).

23 On March 23, 2005, Brandon Brasher, PAC,[1] completed a medical source statement.
24 (Tr. 18, 194-196). The written statement allowed for four hours of sitting, four hours of
25 standing, two hours of walking, lifting up to five pounds occasionally, carrying up to five

---

[1] Plaintiff states that Brandon Brasher was Dr. Lindsay's physician's assistant. (Dkt. 15, ¶ 2).

- 4 -

1  pounds occasionally, use of right hand for simple grasping, and reaching occasionally. (Tr.
2  194-196). Mr. Brasher noted that Plaintiff could not use either hand for pushing/pulling of
3  controls or fine manipulation, and could not bend, squat, crawl, or climb. (Tr. 194-196). Mr.
4  Brasher indicated mild restrictions on being around moving machinery and driving
5  automobile equipment. (Tr. 194-196). Mr. Brasher further indicated that Plaintiff was
6  limited in his activities by "severe" pain, noting that the pain was in Plaintiff's lower back
7  and left upper arm. (Tr. 194-196).

### C.  **Mental Health History**

On August 4, 2003, DDS referred Plaintiff to Minette Nance Doss, Ed.D. for a psychological exam. (Tr. 139-148). Dr. Doss diagnosed borderline intellectual function, reporting that although Plaintiff complained of memory difficulties, his memory abilities appeared to be intact and were in the average range. (Tr. 139-148). Dr. Doss opined that Plaintiff had serious limitations on his ability to understand, remember and carry out complex job instructions, but had good or very good ability in all other areas of making occupational, performance, or personal/social adjustments. (Tr. 139-148). Dr. Doss also believed Plaintiff could manage his own benefits. (Tr. 148).

### D.  **Plaintiff's Testimony**

At the time of the hearing, Plaintiff was fifty-two years old and had a high school education. (Tr. 203). He lived alone in a trailer/mobile home. (Tr. 203). Plaintiff was a painter until 2001 when he stopped because of the pain. (Tr. 204). Plaintiff also was unable to keep up with the paperwork of running his painting business after his divorce because his wife had always handled those matters. (Tr. 208). The paperwork handed by his former wife consisted of contracts for jobs, and paperwork required for hiring, payroll, taxes, and bidding on jobs. (Tr. 212). She also calculated what materials would be required for a painting job based on information Plaintiff gave her. (Tr. 212). Plaintiff testified that he could never do what she did because he handled only the physical painting part of the job. (Tr. 212). After he quit painting, he attempted to work as a supervisor for six weeks, but that didn't work out

1    for him. (Tr. 204). At the time of the hearing, Plaintiff had no income and needed to reapply
2    for food stamps, which had run out five or six weeks prior. (Tr. 205).

3    Plaintiff testified that he had constant pain in his back and shoulders. (Tr. 204). The
4    pain was more severe in his right shoulder than his left. (Tr. 204). Plaintiff described his
5    pain as a seven out of ten on average, though it would go all the way up to ten at times. (Tr.
6    209). When his pain levels increased, Plaintiff applied heat to his shoulder and ice. (Tr.
7    210). Plaintiff testified that he had problems sleeping due to the pain, and that when he lays
8    down to sleep that is when there is the most pain in his shoulders. (Tr. 208; 210-211).
9    Plaintiff experienced less shoulder pain when he was standing up. (Tr. 210-211). At the time
10   of the hearing he was not taking any medication because his Access had stopped and he
11   needed to reapply. (Tr. 205; 209-210). When he was on medication, Plaintiff took Vicodin
12   and blood pressure pills, both without side effects. (Tr. 210).

13   Plaintiff testified that he could only walk forty-five minutes to an hour before having
14   to sit down, and similarly, could only sit for that same length of time before having to move
15   around. (Tr. 205-206). Plaintiff claimed that he could lift twenty pounds if he had to, but
16   usually wouldn't lift anything heavier than five pounds without somebody helping him. (Tr.
17   206). Plaintiff stated that he could reach his arms out in front of him and over his head, but
18   was only able to wash his hair with his left hand. (Tr. 206). Plaintiff testified that he could
19   not stoop or bend comfortably and had difficulty twisting his body to the right and left. (Tr.
20   206). Plaintiff stated that he could squat or kneel if he had to and had no difficulty with
21   balance or walking on uneven surfaces. (Tr. 206). Extreme changes in temperature and
22   dampness also affected Plaintiff's pain levels. (Tr. 207). Plaintiff went through physical
23   therapy, which he testified made his shoulders worse. (Tr. 207).

24   Plaintiff testified that his breathing was normal for someone who had been around
25   fumes and painting his whole life. (Tr. 211). Plaintiff believed that he started having
26   difficulty comprehending things because he did a lot of lacquer work for ten years. (Tr. 211).

27   Plaintiff testified that he was able to take care of his trailer by vacuuming it every two
28   weeks, but never swept or mopped. (Tr. 207). Plaintiff was also able to drive. (Tr. 207).

1 While dressing was difficult, Plaintiff was able to do it. (Tr. 208). Plaintiff kept the
2 paperwork in his life simple. (Tr. 212). He could pay his electric bill and water bill with
3 money that he had been borrowing from his mother for four or five years. (Tr. 212).
4 Plaintiff had trouble with the forms required for Social Security, could not read on an
5 extended basis, and never used a computer. (Tr. 213).

6       **E.**    **Vocational Expert's Testimony**

7 Vocational expert Mark Kelman testified that he had reviewed the exhibits to the file
8 and Plaintiff's work history. (Tr. 213-214). Mr. Kelman described the work of a painter as
9 a medium and heavy skill job, requiring lifting ability up to seventy pounds. (Tr. 214). Mr.
10 Kelman identified Plaintiff's transferable skills as his knowledge and skills in painting, and
11 knowledge of the products used. (Tr. 214).

12 The ALJ proposed the following hypothetical individual to Mr. Kelman: A male of
13 Plaintiff's age with a high school education and a similar work history; capable of frequently
14 lifting five to ten pounds; occasionally lifting up to 20 pounds; standing or walking six hours
15 in an eight hour day; sitting up to six hours in an eight hour day; no restrictions on pushing,
16 pulling, and hand and foot controls; occasionally can climb, balance, stoop, kneel, crouch,
17 and crawl; occasional limited reaching in all directions with both hands and; non-exertional
18 limitations of maintaining concentration because of borderline intellectual functioning. (Tr.
19 215). Mr. Kelman testified that such a person could not return to Plaintiff's past relevant
20 work, but could be a cashier at a courtesy booth or fuel island. (Tr. 215-216). There were
21 1,000 statewide jobs of that nature and in excess of 100,000 in the nation. (Tr. 216). Such
22 a person could also be a gate guard or security guard. (Tr. 216). There were 2,000 statewide
23 jobs of that nature and several hundred thousand in the nation. (Tr. 216).

24 The ALJ proposed the following hypothetical to Mr. Kelman: An individual who can
25 sit about four hours in an eight hour day, stand about four hours in an eight hour day, and
26 walk about two hours in an eight hour day; could occasionally lift up to five pounds; could
27 use hands for continuous action for five minutes, such a simple grasping, although the
28 dominant hand having difficulty pushing and pulling controls; no use of feet for repetitive

1   movement such as pushing of leg control; inability to bend, squat, crawl, climb; occasional
2   reaching and; moderate restrictions being around machinery and driving automotive
3   equipment. (Tr. 216).  Mr. Kelman testified that such an individual could not return to
4   Plaintiff's past relevant work, but could work in cashiering, courtesy booth, or fuel island
5   jobs that have sitting or standing options. (Tr. 216-217). Given the limitation on simple
6   grasping by the dominant hand, the job of security guard of a gatehouse, with option of
7   sitting or standing, would have about 500 statewide jobs and 60,000 nationally. (Tr. 217).
8   Mr. Kelman further testified that if such a person suffered from a severe pain level, it would
9   preclude work. (Tr. 217-218). Mr. Kelman testified that based on Plaintiff's testimony there
10  was no work for a person with Plaintiff's stated limitations. (Tr. 218).

11      Mr. Kelman testified that, with regard to cashiering jobs, basic math skills would be
12  required and that there might be other paperwork involving basic math, though he could not
13  testify to specifics. (Tr. 219). The paperwork involved with cashiering would be different
14  than filling out Social Security forms or forms for running a business. (Tr. 219). If a person
15  didn't have basic math skills, such a job would be difficult. (Tr. 219-220).

16      **F.    The ALJ's Findings**

17      The ALJ concluded that Plaintiff has not engaged in substantial gainful activity since
18  the amended disability onset date. (Tr. 16). The ALJ identified Plaintiff's impairments as
19  degenerative joint disease of the left shoulder, arthritis, synovitis involving the left AC joint,
20  lower back pain, hypertension, and borderline intellectual functioning. (Tr. 16). The ALJ
21  found these impairments "severe" within the meaning of the Act and Regulations. As related
22  to applicable listings 1.02, 1.04, 4.04, and 12.02, the ALJ found that Plaintiff's impairments
23  did not meet or medically equal in severity the appropriate medical criteria of any impairment
24  listed in Appendix 1, Subpart P. Regulations No. 4. (Tr. 16).

25      The ALJ agreed with Mr. Brasher's assessment of Plaintiff's ability to do work related
26  activities, but did not accept Mr. Brasher's opinion that Plaintiff experiences "severe" pain
27  as a result of his impairments. (Tr. 18). The ALJ gave little weight to Mr. Brasher's opinion,
28  finding that it was not substantiated by the objective evidence of the record as a whole. (Tr.

- 8 -

18). The ALJ determined that Plaintiff retained the "residual functional capacity to lift and/or carry up to five pounds occasionally, and sit for four hours, stand four hours and walk two hours in an eight hour day. He is able to use his right dominant hand for simple grasping, but has difficulty with pushing/pulling and fine manipulation, or any combination thereof, with either hand. [Plaintiff] is unable to use his feet for repetitive movements, but can occasionally reach. He is unable to bend, squat, crawl, climb, and has mild restriction of activities involving unprotected heights and driving automobile equipment. [Plaintiff] has moderate limitations in his ability to maintain concentration, persistence or pace." (Tr. 19). Considering these limitations, Plaintiff's past work as a painter, and Mr. Kelman's testimony, the ALJ found that Plaintiff was unable to perform his past relevant work, or work to which his skills are transferable. (Tr. 19).

The ALJ then determined, in light of Plaintiff's residual functional capacity, the vocational factors, and Mr. Kelman's testimony, that Plaintiff could perform certain unskilled jobs. (Tr. 19). Specifically, relying on Mr. Kelman's opinion of available non-skilled jobs based on a hypothetical question, the ALJ found that Plaintiff could work as a cashier with a sit/stand option. (Tr. 19). There are 1,000 such jobs in the region and over 100,000 jobs in the nation. (Tr. 19). The ALJ also found that Plaintiff could work as a security gate guard with a sit/stand option. (Tr. 19). There are 500 such jobs in the region and 60,000 in the nation. (Tr. 19).

Based on the above, the ALJ determined that Plaintiff has not been under a "disability," as defined in the Act and Regulations, at any time through the date of the decision. (Tr. 19).

**III. Standard of Review**

The Court reviews the Commissioner's final decision under a substantial evidence standard; the decision will be disturbed only if it is not supported by substantial evidence or based on legal error. See 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). "Substantial evidence" means "more than a scintilla," but "less than a preponderance."

- 9 -

Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal citations omitted). In determining whether the Commissioner's finding are supported by substantial evidence, the Court considers the evidence as a whole, giving a full review to all the facts. Smolen, 80 F.3d at 1279.

**IV.   Discussion**

The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in the following five-step evaluation:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, App. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the residual functional capacity ("RFC") to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005); 20 C.F.R. § 404.1520. Here, the ALJ found that Plaintiff satisfied steps one, two, and four: Plaintiff "has not engaged in substantial gainful activity since September 30, 2002[,]" has "'severe' impairments within the meaning of the Act and Regulations[,]" and is "unable to perform his past relevant work[.]" (Tr. 20).

Where a claimant's impairments prevent him or her from performing past relevant work, as is the case here, the Social Security Administration bears the burden of proving whether the claimant can "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's "age, education, and work experience...regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." See 42 U.S.C. § 423(d)(2)(A).

- 10 -

### A.     The ALJ's Determination Plaintiff's Pain Intensity

The ALJ is required to consider all symptoms, including pain, and the extent to which objective medical evidence and other evidence confirm these symptoms. See 20 C.F.R. § 404.1529. Medical evidence refers to medical signs[2] and laboratory findings.[3] 20 C.F.R. § 404.1528. Other evidence refers to statements or reports from the claimant, the treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairment(s) and any related symptoms affect his or her ability to work. 20 C.F.R. § 404.1529. Statements about a claimant's pain or other symptoms will not alone establish disability. There must be medical signs and laboratory findings which show that medical impairments which could reasonably be expected to produce the pain or other symptoms alleged. Id.

There is sufficient medical evidence in the record to support a finding that Plaintiff was in severe pain. On the amended onset set, Plaintiff began treatment with Dr. Lindsay. (Tr. 105). On May 9, 2003, Dr. Lindsay reported Plaintiff's complaints of lack of sleep due to back pain and advised that Plaintiff was to drop his weight by thirty pounds to help his back pain. (Tr. 101). Radiological studies revealed an old compression fracture at the L4 vertebral body, and reasonably well-preserved disc spaces. (Tr. 18; 101; 109). On January 12, 2004, Dr. Lindsay opined that Plaintiff could not do any jerking or lifting. (Tr. 189). X-rays of Plaintiff's left shoulder at that time revealed arthritic involvement of the AC joint.

---

[2] "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques....." 20 C.F.R. § 404.1528(b).

[3] "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

(Tr. 189-190). Similarly, Dr. Kazmi's evaluation of Plaintiff revealed a left rotator cuff problem and acromioclavicular joint dysfunction, intractable lower back pain most likely from spinal stenosis, cervical pain of muskuloskeletal nature, and chronic intractable pain in the shoulder, lower back and neck. (Tr. 150-153). Dr. Lindsay's and Dr. Kazmi's assessments were very similar.

The ALJ failed to meet his burden of setting forth specific, legitimate reasons for disregarding the assessment of Dr. Lindsay's physician assistant, Mr. Brasher. See Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ accepted the majority of Mr. Brasher's assessments, but rejected Mr. Brasher's opinion that Plaintiff suffered from "severe" pain, stating only that he was according "little persuasive weight to this opinion of Mr. Brasher since it is not substantiated by the objective evidence of record as a whole." (Tr. 18). The ALJ provided no analysis of the facts leading to his decision to reject Mr. Brasher's determination, and stated only that the objective evidence did not support this one part of his finding. The Court's independent review of the record reveals that Mr. Brasher's assessment of limitations is consistent with the medical evidence and other evidence in record, as was his opinion that Plaintiff suffered from severe pain. Both Dr. Lindsay's and Dr. Kazmi's diagnoses support Plaintiff's claim that he was in severe pain, as does the evidence offered of Plaintiff's limited daily activities. Thus, the ALJ's determination that Plaintiff did not suffer from severe pain is not supported by substantial evidence.

### B.     The ALJ's Decision Denying Benefits

The ALJ's decision to deny benefits is based in-part on the conclusion that Plaintiff did not suffer from extreme pain. Mr. Kelman, the vocational expert, testified that a person with Plaintiff's limitations who suffered from severe pain could not engage in any type of substantial work that exists in the national economy.[4] (Tr. 217-218). The ALJ accepted Mr.

---

[4] Even if Plaintiff was not suffering from severe pain, the Court doubts that he possesses the intellectual capacity and experience necessary to work as a cashier or security guard. The record demonstrates that Plaintiff, who is in his fifties and has only a high school education, has difficulty completing even simple paperwork. (Tr. 204-213). Dr. Doss

- 12 -

Kelman's expert testimony in all regards, and the Court has no reason to disregard it. Because the Court finds that Plaintiff did suffer from severe pain, the Court adopts the vocational expert's testimony and finds that Plaintiff is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment...." 42 U.S.C. § 423(d)(1)(A). Disability benefits will be awarded beginning on Plaintiff's amended onset date of September 20, 2002.

Accordingly,

**IT IS ORDERED:**

1. **GRANTING** Plaintiff's Motion for Summary Judgment (Dkt. 13).
2. **DENYING** Defendant's Cross-motion for Summary Judgment (Dkt. 19).
3. **REVERSING** the decision of the Commissioner denying benefits.
4. **REMANDING** for payment of benefits for Plaintiff's disability beginning on September 20, 2002.

DATED this 28th day of September, 2007.

Earl H. Carroll
United States District Judge

---

assessed Plaintiff's Full Scale IQ at 84, ranking him at the 14th percentile at the upper end of the borderline range. (Tr. 142).

- 13 -